IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

EMOVE INCORPORATED,

Plaintiff,

v.                                                          NO. CV-10-02052-PHX-JRG

SMD SOFTWARE INCORPORATED, et al.,

Defendants.

## MEMORANDUM OPINION AND ORDER

### I.      Introduction

Pending before the court are the defendants' Motion for Summary Judgment [Docket 70] and the plaintiff's Rule 15(d) Motion for Leave to File First Supplemental Complaint [Docket 157].   For the reasons discussed below, the defendants' Motion for Summary Judgment is **GRANTED**, and the Rule 15(d) Motion for Leave to File First Supplemental Complaint is **GRANTED**.

eMove Inc. filed its complaint on August 31, 2010, in Maricopa County Superior Court, Arizona.   On September 23, 2010, the defendants removed the case to this court.   The complaint brings several claims: (1) business defamation/injurious falsehood; (2) tortious interference with business relationships; (3) interference with valid business expectancy; (4) violation of the Lanham Act; and (5) common law unfair competition.   A hearing on the defendants' Motion for Summary Judgment and Daubert Motion was held on April 5, 2012.

### II.     Factual Background

This suit arises out of statements allegedly made by Markus Hecker and other employees of SMD Software, Inc. ("SMD") and SiteLink LLC ("Sitelink") about eMove, Inc. ("eMove") and WebSelfStorage, the software product eMove promotes.  eMove and SMD/SiteLink compete for business by selling software products to the owners and managers of self-storage facilities. The defendants sell the SiteLink software.  There are two versions of SiteLink.  A PC-based version is owned and sold by SMD and a web-enabled version, SiteLink Web Edition, is owned and sold by SiteLink.   SiteLink Web Edition can process customer payments, generate accounting reports and pre-formatted letters to customers, and provide customers with online access to their accounts.  Defendant Markus Hecker is the Chief Operating Officer of SMD and SiteLink.

eMove is a wholly-owned subsidiary of U-Haul International, Inc. ("U-Haul").  Like the defendants, eMove markets a software program—WebSelfStorage.  The software program itself, however, is owned by another U-Haul subsidiary, Web Team & Associates.  Web Team & Associates is responsible for maintaining and developing WebSelfStorage.  U-Haul also owns self-storage facilities and these facilities use WebSelfStorage.[1]

eMove also markets what it calls the "eMove Storage Affiliate Program."  (eMove, Inc.'s Resp. Defs.' Statement of Facts & eMove's Supplemental Statement of Facts [Docket 147], at 5.) According to eMove, the program is, "an alliance of independent self-storage operators who connect to the world's largest storage network."  (*Id.*)  eMove offers its customers two levels of service, described as follows:

---

[1] The defendants claim that U-Haul owned self-storage facilities use the software at no charge, citing the deposition of eMove's director, Sam Celaya.  (Decl. Erick Ottoson Supp. Defs.' Mot. Summ. J. [Docket 72-3], Ex. 6, at 46.)  In its response to the defendants' statement of facts, the plaintiff states that U-Haul owned self-storage facilities' use of WebSelfStorage is governed by the Master Services Agreement, which is proprietary and confidential.  (eMove, Inc.'s Resp. Defs.' Statement of Facts & eMove's Supplemental Statement of Facts [Docket 147], at 5.)

Basic Level is FREE to join.  Affiliates enjoy reservations from the world's largest moving and storage reservation network, along with visibility on www.emove.com and www.uhaul.com.

Premier Level includes an enhanced online listing and reservation capability, while adding the power of WebSelfStorage software, the total online self-storage management package.  WebSelfStorage offers a comprehensive package of fully integrated benefits including: payment processing, SafeStor Tenant insurance, Centralized and Certified Mailing service, the eMove Call Center, online account management and much more.

(*Id.*)

eMove claims that "Any self-storage business may list itself on eMove's website. . . . Each Affiliate has its own webpage that is hosted on eMove.com."  (Resp. Defs.' Mot. Summ. J. [Docket 146], at 5.)  This description, however, is misleading.  eMove.com has a link inviting website visitors to "Find a convenient self-storage location from our 4,000+ facility network." (eMove, Inc.'s Resp. Defs.' Statement of Facts & eMove's Supplemental Statement of Facts [Docket 147], at 14.)  Clicking on this link directs users to webselfstorage.com/en/self_storage. (*Id.*)  Consequently, the "online marketplace" is located on webselfstorage.com rather than emove.com.  Webselfstorage.com is registered to U-Haul.  On this site, each affiliate has its own page, and self-storage facility customers can view these pages and reserve a unit.   Moreover, U-Haul provides eMove with human resources and accounting functions.  U-Haul also provides technical support and the processing of credit card payment transactions for eMove affiliates. Finally, eMove affiliates are promoted on uhaul.com and through 1-800-GO-UHAUL.

eMove alleges that the defendants disparaged it and WebSelfStorage to individuals through telephone conversations and emails, on Internet forums, and at trade shows.  The plaintiff has submitted excerpts of the defendants' emails and call log.  Mr. Hecker explained that the purpose of the call log is to record topics of discussion with customers and prospective

customers.  The plaintiff highlights that eMove is mentioned over fifty times in the call log. Additionally, the plaintiff has submitted excerpts from the message board on an industry website, SelfStorageGuide.com, where Mr. Hecker made comments or answered other people's questions.

Two of the plaintiff's employees allege that they overheard Mr. Hecker disparaging eMove and its products at trade shows.  Specifically, Casey Huberty, a marketing manager for eMove, alleges that in August 2010 he attended the Missouri Self-Storage Association trade show.  (Resp. to Statement of Facts [Docket 147-4], Ex. D.)  Mr. Huberty claims that he was at the hotel bar with the U-Haul area manager, several vendors, and a representative from a self-storage insurance company.  While discussing the products at the trade show, Mr. Hecker walked up behind them and said "F*ck U-Haul."  Additionally, in April 2010 Sebastian Goldsberry attended the Self Storage Association Tradeshow in Colorado.  (Resp. to Statement of Facts [Docket 147-3], Ex. C.)  At the trade show, Mr. Hecker made a presentation to self-storage facility owners and managers assembled at his booth.  (*Id.*)  Mr. Goldsberry alleges that Mr. Hecker referred to eMove as U-Haul and told the group that when a customer is searching for a specific non-U-Haul affiliated eMove.com member, the eMove.com website displays U-Haul owned self-storage facilities.  (*Id.*)

An important part of the plaintiff's case is the "Lorton Fax."  In 2010, Lorton Self Storage ("Lorton") asked a consultant, Sean Magoon, to prepare talking points about the differences between WebSelfStorage and SiteLink.  To do so, Mr. Magoon looked on the Internet and spoke with Mr. Hecker and Sharon Brannagan.  Mr. Hecker has no recollection of his discussion with Mr. Magoon.  The fax is titled "U-Haul vs. SiteLink" and contains a list of "Important differences," including: "U-Haul is set up for U-Haul self storage facilities"; "There are charges for reservations.  No charges with Sitelink"; and "Echo is the payment processor."

4

(Decl. Erick Ottoson Supp. Defs.' Mot. Summ. J. [Docket 72-2], Ex. 1.)  Upon receiving Mr. Magoon's talking points, the property manager of Lorton, Camille Ortiz, sent the Lorton Fax to eMove, dismissing it as "foolishness."  Shortly after receiving the fax, Lorton switched from the defendants' product, SiteLink, to WebSelfStorage.  eMove has disclaimed damages arising from the fax.[2]

The plaintiff alleges that the defendants' campaign of disparagement caused eMove's growth rate to decline and damaged its goodwill.  As support, the plaintiff provides a report by MCA Financial Group and offers the testimony of Morris C. Aaron.  The defendants argue that Mr. Aaron's report and testimony are inadmissible because they fail the *Daubert* criteria. Because I find that the plaintiff has failed to raise a genuine issue of material fact as to the defendants' liability on other grounds, I do not reach the defendants' *Daubert* challenge.

### III.    Summary Judgment Standard of Review

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Instead, the court will draw any permissible inference from the underlying facts in

---

[2] The defendants argue that the court should not attribute the talking points from the Lorton Fax to Mr. Hecker.  Mr. Magoon prepared the fax "with input from . . . Mar[k]us Hecker."  (Decl. Erick Ottoson Supp. Defs.' Mot. Summ. J. [Docket 72-1], Ex. 1.)  Mr. Magoon was asked in his deposition whether Mr. Hecker was the primary source of information in creating the Lorton Fax.  His response was: "I do not know that."  (Resp. to Statement of Facts [Docket 147-7], Ex. G, at 21.)  When asked why he referred to eMove's software as "U-Haul," Mr. Magoon stated: "That was my only association with that software, was – was the term 'U-Haul.'"  (*Id.*)  He further stated that he does not know where he picked up that association.  Mr. Magoon also did not remember specifically where he acquired each piece of information that is in the Lorton Fax.  Although the defendants raise a good point, it is not necessary to determine whether a reasonable trier of fact could conclude that Mr. Hecker made the statements memorialized in the Lorton Fax, because even if he did, the plaintiff has failed to raise a genuine issue of material fact as to whether these allegedly false statements are commercial advertising or promotion for purposes of the Lanham Act claim.  The plaintiff also fails to raise a genuine issue of material fact as to the state law claims because it has disclaimed damages arising from the fax.

the light most favorable to the nonmoving party.   *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256.  Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position.  *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or unsupported speculation, without more, are insufficient to preclude the granting of a summary judgment motion.  *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081-82 (9th Cir. 1996).

## IV.   Applicable Law

### a.   Lanham Act

The Lanham Act serves in part "to protect persons engaged in commerce against false advertising and unfair competition."  *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998).  eMove alleges that the defendants violated § 1125(a) of the Lanham Act.  That section states:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which – (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).  Interpreting this statutory section, courts have developed a five-part test to determine whether a defendant has violated § 1125(a).  Accordingly, the elements of a false advertising claim are:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).  I discuss each element in turn.[3]

i.   <u>Falsity</u>

Statements that are literally false, and some that are literally true, may be actionable under the Lanham Act.  A statement may be literally false on its face or by necessary implication.  *Nat'l Prods., Inc. v. Gamber Johnson LLC*, 699 F. Supp. 2d 1232, 1237 (W.D. Wash. 2010).  When evaluating whether a claim is literally false, the claim must be analyzed in its full context.  *Southland Sod Farms*, 108 F.3d at 1139.  A statement is necessarily false by implication when, considering it in its entirety, "the audience would recognize the claim as readily as if it had been explicitly stated."  *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 586-87 (3d Cir. 2002).  "The greater the degree to which a message relies upon the viewer or consumer to integrate its components and draw the apparent conclusion, however, the less likely it is that a finding of literal falsity will be

---

[3] The parties do not provide any briefing on whether the defendants caused the allegedly false statements to enter interstate commerce.  Because the court disposes of the motion on other grounds, I do not discuss this prong of the test.

supported." *Id.* (quoting *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1181 (8th Cir. 1998)).  Whether a statement is literally false is a question of fact.  *Nat'l Prods., Inc.* 699 F. Supp. 2d at 1237.  Alternatively, the statement may be literally true, but likely to mislead or confuse consumers.  *Id.*  If an advertisement is literally true, the plaintiff must produce extrinsic evidence of the way it is perceived by customers, often through market research or consumer surveys.  *Walker & Zanger, Inc. v. Paragon Indus., Inc.*, 549 F. Supp. 2d 1168, 1182 (N.D. Cal. 2007).

In addition, puffery is not actionable under the Lanham Act.  Puffery is "exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely."  *Southland Sod Farms*, 108 F.3d at 1145.  The difference between a statement of fact and puffery lies in the specificity or generality of the claim.  *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1053 (9th Cir. 2008).  Subjective claims of product superiority amount to nonactionable puffery. *Southland Sod Farms*, 108 F.3d at 1145.  Determination of whether an alleged misrepresentation is puffery is a matter of law.  *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 245 (9th Cir. 1990).

ii.   Commercial Advertising or Promotion

In order to be considered "commercial advertising or promotion," the misrepresentations must be: "(1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services." *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999) (quoting *Gordon & Breach Sci. Publishers v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1536 (S.D.N.Y. 1994)).  Although the representations can be made in informal types of promotion, they must be "disseminated sufficiently to the relevant purchasing public to constitute

'advertising' or 'promotion' within that industry." *Id.* Displays at trade shows and sales presentations to buyers can constitute promotion. *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1385 (5th Cir. 1996). However, representations that are commercial advertising or promotion under the Lanham Act must be part of an organized campaign to penetrate the market, rather than isolated disparaging statements. *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002). Factors to consider in determining whether the statements rise to commercial advertising or promotion include the number of alleged statements, to whom the statements were made, and the size of the relevant market. *Chamilia, LLC v. Pandora Jewelry, LLC*, No. 04-cv-6017, 2007 WL 2781246, at *8 (S.D.N.Y. Sept. 24, 2007).

      iii.    <u>Deception and Materiality</u>

Typically, the plaintiff must present evidence that the defendant's false statement actually deceived or had the tendency to deceive a substantial segment of its audience. *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1180 (9th Cir. 2003). However, if the defendant intentionally misled consumers, the court presumes that consumers were in fact deceived, and the defendant would have the burden of rebutting this presumption. *William H. Morris Co. v. Grp. W, Inc.*, 66 F.3d 255, 258 (9th Cir. 1995). Moreover, when a statement of fact is literally false, the court presumes deception. *Pernod Richard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 248 (3d Cir. 2011). In addition to being deceptive, the statement must also be likely to influence purchasing decisions. *Rice*, 330 F.3d at 1181. Materiality can be proven through consumer surveys or consumer testimony. *Skydive Ariz., Inc. v. Quattrocchi*, CV 05-2656, 2009 WL 6597892, at *27 (D. Ariz. Feb. 2, 2009).

      iv.    <u>Injury</u>

The proof of injury necessary to sustain a Lanham Act claim depends on the relief sought by the plaintiff.  In *Harper House, Inc. v. Thomas Nelson, Inc.*, the Ninth Circuit recognized that the plaintiff presented no evidence of injury causally related to the defendants' deception.  889 F.2d 197, 210 (9th Cir. 1989).  However, the court reasoned that, "because of the possibility that a competitor may suffer future injury, as well as the additional rationale underlying section 43(a)—consumer protection—a competitor need not prove injury when suing to enjoin conduct that violates section 43(a)."  *Id.*  In contrast, the court stated that in a suit for damages, actual evidence of some injury resulting from the deception is an essential element of the plaintiff's case.  *Id.*

The Ninth Circuit later qualified this distinction.  In *Southland Sod Farms v. Stover Seed Co.*, the court explained that although it stated in *Harper House* that actual evidence resulting from the deception is essential in a suit for damages, a more recent decision held that the inability to show damages does not alone preclude recovery.  108 F.3d 1134, 1146 (9th Cir. 1997).  Rather, the preferred approach is to allow the district court in its discretion to fashion relief based on the totality of the circumstances.  *Id.*  The Ninth Circuit observed that when a claim involves false advertising rather than "palming off," courts are more willing to allow monetary damages without a showing of actual consumer confusion.  *Id.*  Specifically, in false comparative advertising claims, the publication of deliberately false comparative claims gives rise to a presumption of actual deception and reliance.  *Id.*  If the plaintiff is entitled to a presumption of actual consumer deception and reliance, it is entitled to appropriate monetary relief unless the defendants can rebut the presumption.  *Id.*

In a recent decision, the Ninth Circuit recognized that nothing in the Lanham Act conditions an award of profits on the plaintiff's proof of harm, and profits may be awarded

without such proof. *TrafficSchool.com v. Edriver Inc.*, 653 F.3d 820, 831 (9th Cir. 2011). Although proof of harm is not necessary, an award of profits without such a showing is an "uncommon remedy." *Id.* It is appropriate, however, in false comparative advertising cases, "where it's reasonable to presume that every dollar defendant makes has come directly out of plaintiff's pocket." *Id.*

b. *Business Defamation/Injurious Falsehood*

Next, the plaintiff brings a claim under the state law tort of business defamation, or alternatively titled, injurious falsehood. In Arizona, injurious falsehood is "the publication of matter derogatory to the plaintiff's business which is calculated to prevent others from dealing with him." *Aldabbagh v. Ariz. Dept. of Liquor Licenses & Control*, 162 Ariz. 415, 421 (1989). The Restatement (Second) of Torts states: "One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if (a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and (b) he knows that the statement is false or acts in reckless disregard of its truth or falsity." RESTATEMENT (SECOND) OF TORTS § 623A (1977). The plaintiff must show resulting pecuniary loss. *Allen v. Quest Online, LLC*, No. CV-11-138, 2011 WL 4403674, at *8 (D. Ariz. Sept. 22, 2011) ("Plaintiff must prove that Defendants intentionally published an injurious falsehood disparaging the quality of his property or product, with resulting pecuniary loss.").

c. *Tortious Interference with Business Relationships and Interference with Valid Business Expectancy*

The elements of intentional interference with a business relationship are: "(1) [t]he existence of [a] valid contractual relationship or business expectancy; (2) knowledge of the

relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Antwerp Diamond Exch. of Am., Inc. v. Better Bus. Bureau of Maricopa Cnty., Inc.*, 130 Ariz. 523, 530 (1981).  To sustain a claim for loss of a business expectancy, the plaintiff must "identify a specific relationship with which the defendant interfered."  *Dube v. Likins*, 216 Ariz. 406, 414 (Ariz. Ct. App. 2007).   The expectancy must constitute more than a mere hope.  *Id.* at 412.  Moreover, the interference must be improper and intentional.  *AIRFX.com v. AirFX LLC*, No. CV 11-01064, 2011 WL 6846428, at *1 (D. Ariz. Dec. 29, 2011).  Finally, damages must be established with reasonable certainty; if they are speculative or remote, they may not form the basis for a judgment.  *Soilworks, LLC v. Midwest Indus. Supply, Inc.*, 575 F. Supp. 2d 1118, 1128 (D. Ariz. 2008).

> d.  *Common Law Unfair Competition*

"The common law doctrine of unfair competition is based on principles of equity . . . . The general purpose of the doctrine is to prevent business conduct that is contrary to the honest practice in industrial or commercial matters."  *Fairway Constructors, Inc. v. Ahern*, 193 Ariz. 122, 124 (Ariz. Ct. App. 1998) (internal citations omitted).   The doctrine encompasses several tort theories, including trademark infringement, false advertising, "palming off," and misappropriation.  *Id.*  The Ninth Circuit has held that state law unfair competition claims are congruent with Lanham Act claims.  *See Willliams v. UMG Recordings, Inc.*, 281 F. Supp. 2d 1177, 1186 (C.D. Cal. 2003).

**V.    Analysis**

> a.  *False Advertising under the Lanham Act*

The first element of a Lanham Act false advertising claim is a "false statement of fact" by the defendant. *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). Once the false statements of fact are identified, the plaintiff must prove that *each* false statement of fact was a commercial advertisement or promotion, entered into interstate commerce, and was deceptive, material, and injurious. *Id.* A plaintiff cannot sustain its Lanham Act claim by merely throwing mud at the wall and hoping that some of it will stick. This is precisely what the plaintiff has done in this case. Because the plaintiff's theory of the case has evolved, I rely on the plaintiff's response to the defendants' motion for summary judgment, and the accompanying statement of facts and exhibits, to determine which statements the plaintiff claims to be actionable under the Lanham Act.[4]   [Dockets 146 & 147.]   As discussed below, with the exception of one statement, the plaintiff has failed to raise a genuine issue of material fact as to whether the statements have been sufficiently disseminated to the relevant purchasing public to constitute commercial advertising or promotion. The defendants are also entitled to judgment as a matter of law on the remaining statement because the plaintiff has failed to raise a genuine issue of material fact as to its falsity.

     i.   Commercial Advertisements or Promotions

The Lanham Act provides a remedy for false statements of fact made in commercial advertising or promotion. The terms "advertising" and "promotion" should be given their plain and ordinary meanings. *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1384 (5th Cir. 1996). To be considered commercial advertising or promotion, the representation must be:

---

[4] The record demonstrates that at times the plaintiff has complained that the defendants told customers and potential customers that eMove's server crashed in 2003. In addition, eMove has alleged that the defendants improperly conflate U-Haul and eMove. However, neither of these statements is included in the plaintiff's chart in its response to the motion for summary judgment, which identifies the false statements in dispute. (Resp. Defs.' Mot. Summ. J. [Docket 146], at 16-17.)  At the summary judgment hearing, plaintiff's counsel stated that the plaintiff is not alleging that statements about the server crash are actionable. Accordingly, I **FIND** that these statements are not in dispute and will not address them further, except as they arise in the context of other allegedly false statements.

(1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's good or services. While the representations need not be made in a "classic advertising campaign," but may consist instead of more informal types of "promotion," the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry. Although representations can be made in an informal promotion, rather than traditional advertising, they must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999). Here, the fourth prong of the above-stated test is in dispute. Whether the representation has been disseminated sufficiently to the relevant purchasing public is a fact-specific inquiry. The Tenth Circuit has explained that, "the extent of distribution necessary to constitute commercial advertising or promotion in a particular case may be an elastic factor, so that a relatively modest amount of activity *may* be sufficient in the context of a particular case." *Sports Unlimited, Inc. v. Lankford Enter., Inc.*, 275 F.3d 996, 1005 (10th Cir. 2002) (emphasis added).

In some cases, courts have found that a single communication or a handful of communications was sufficiently disseminated to the relevant purchasing public. In such instances, however, the market is typically small. *See Coastal Abstract Serv.*, 173 F.3d at 735 (upholding the district court's determination that if the plaintiff's view of the market—that there were only two or three customers—was correct, then a single representation could constitute promotion); *Seven-Up Co.*, 86 F.3d at 1386 ("Where the potential purchasers in the market are relatively limited in number, even a single promotional presentation to an individual purchaser may be enough to trigger the protections of the Act."); *Am. Traffic Solutions, Inc. v. Redflex Traffic Sys., Inc.*, CV-08-02051, 2010 WL 1640975, at *3 (D. Ariz. April 22, 2010) ("A reasonable trier of fact could find that disseminating contract proposals to eleven governmental entities constitutes promotion in defendant's industry."); *Mobius Mgm't Sys., Inc. v. Fourth*

*Dimension Software, Inc.*, 880 F. Supp. 1005, 1020-21 (S.D.N.Y. 1994) ("Fourth Dimension's letter to M&I was 'disseminated sufficiently to the relevant purchasing public . . . .' [T]he relevant purchasing market is quite small. . . . Moreover, in this case the true purchasing public consisted solely of M&I.").

Other courts have found that a single communication or a handful of communications was not sufficiently disseminated to the relevant purchasing public. *See Sports Unlimited, Inc.*, 275 F.3d at 1003 (upholding a district court's finding that when the allegedly false statements were distributed to between two and seven recipients with a customer base of around 150, the distribution was too limited to be considered advertising or promotion within the industry); *Premier Comp Solutions, LLC v. Penn Nat'l Ins. Co.*, No. 07-1764, 2012 WL 1038818, at *8 (W.D. Pa. March 28, 2012) (holding that receipt of the statement to five persons in a relevant purchasing public of hundreds of persons did not constitute commercial advertising or promotion); *Walker & Zanger, Inc. v. Paragon Indus., Inc.*, 549 F. Supp. 2d. 1168, 1182 (N.D. Cal. 2007) ("A handful of statements to customers does not trigger protection from the Lanham Act unless 'the potential purchasers in the market are relatively limited in number,' which is not the case here."); *Optimum Techs., Inc. v. Home Depot USA, Inc.*, No. 1:04-cv-3260, 2005 WL 3307508, at *5 (N.D. Ga. Dec. 5, 2005) ("Unless the relevant purchasing market is particularly limited, which is not the case here, isolated statements by sales personnel to individual customers do not satisfy the requirement of sufficient dissemination."); *Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc.*, 299 F. Supp. 2d 565, 573 (E.D. Va. 2004) ("Where it is clear, however, that the relevant market is large and that the alleged contacts are comparatively trivial, dismissal for failure to state a claim is appropriate."); *Professional Sound Servs., Inc. v.*

*Guzzi*, 349 F. Supp. 2d 722, 729 (S.D.N.Y. 2004) (finding that disseminating a statement to one customer out of thirty-six does not meet the standard for commercial advertising or promotion).

The Second Circuit, in *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, upheld the district court's determination that the statements did not constitute commercial advertising or promotion.  314 F.3d 48, 52-53 (2d Cir. 2002).  The plaintiff, Fashion Boutique, sold Fendi products.  It alleged that its business was destroyed by a disparagement campaign from a competing seller, Fendi Stores, Inc.  *Id.*  In total, the plaintiff presented evidence of twenty-seven oral statements about the plaintiff's product in a market of thousands of customers.  *Id.* at 58.  The court noted that Fendi employees did not initiate conversations about Fashion Boutique.  Rather, they made comments after customers asked about the plaintiff.  *Id.*

The Second Circuit determined that the district court's proactive-reactive distinction was "instructive" but not dispositive.  *Id.* at 57-58.  Typically, reactive statements do not violate the Lanham Act because no broad dissemination was intended or achieved.  *Id.*  However, the court left open the possibility that a Lanham Act violation could exist when a defendant has a strict policy to disparage a competitor every time it is mentioned by a customer and these disparagements reach a substantial number of the competitor's potential customers.  *Id.*  The Second Circuit explained that to be considered commercial advertising or promotion, representations must be part of an organized campaign to penetrate the market, rather than isolated disparaging statements.  *Id.* Therefore, the court held that the plaintiff's evidence was, "insufficient to satisfy the requirement that representations be disseminated widely in order to constitute 'commercial advertising or promotion' under the Lanham Act."  *Id.*[5]

---

[5] The Seventh Circuit has defined commercial advertising and promotion narrowly.  *See First Health Grp. Corp. v. BCE Emergis Corp.*, 269 F.3d 800, 803 (7th Cir. 2001).  It held that "Advertising is a form of promotion to anonymous recipients, as distinguished from face-to-face communication."  *Id.*  Courts have criticized the Seventh Circuit's definition for ignoring the distinction between "advertising" and "promotion."  *See Fashion Boutique of*

In the instant dispute, the plaintiff submits as evidence of dissemination the defendants' emails and call log, excerpts from an online forum, the Lorton Fax, and testimony by its employees who encountered Mr. Hecker at trade shows.  Strikingly absent from the plaintiff's evidence of dissemination is testimony from customers asserting that the defendants made any of the allegedly false statements to them.

eMove contends that the following allegedly false statements were made by the defendants and points to these instances of dissemination in the record:

Allegedly false statement #1: eMove affiliates can only obtain leads and reservations through U-Haul-owned self-storage facilities.   Evidence that this statement has been disseminated:  (1) Lorton Fax: "The leads gained are from U-Haul customers only" and "Makes the manager look good by getting more leads but the leads are only from U-Haul and not from the entire internet." (Decl. Erick Ottoson Supp. Defs.' Mot. Summ. J. [Docket 72-2], Ex. 1.)  (2) April 26, 2010 excerpt from call log: "Reservations only by uhaul reservations, and $6.96 or so fee for tenant, $20 or so for owner.  Only uhaul reservation tenants can rate you."  (Resp. to Statement of Facts [Docket 147-10], Ex. J, at 8.)

Allegedly false statement #2: eMove is solely for the benefit of U-Haul-owned self-storage facilities.[6] Evidence that this statement has been disseminated: (1) Lorton Fax: "U-Haul is set up for U-Haul self-storage facilities." (2) Colorado trade show: Mr. Goldsberry, an eMove employee, alleges that: "Mr. Hecker also stated that eMove.com serves to benefit U-Haul owned self-storage facilities.  As an example of how U-Haul owned self-storage facilities are benefited

---

*Short Hills, Inc.*, 314 F.3d at 57; *Gonzalez v. Allstate Ins. Co.*, CV 04-1548, 2005 WL 5891935, at *8 (C.D. Cal. Aug. 2, 2005).  The Seventh Circuit's definition has also been found inconsistent with the Ninth Circuit's adoption of the *Gordon & Breach* test in *Coastal Abstract*.  *Gonzalez*, 2005 WL 5891935 at *8.
[6] There is another issue with this allegedly false statement.  The three examples that the plaintiff provides as evidence that this statement has been distributed do not convey the assertion that: "eMove is solely for the benefit of U-Haul owned self-storage facilities."  However, even if there were three instances where the defendants repeated precisely the alleged statement, it would fail as a matter of law under the Lanham Act because of insufficient dissemination.

by the eMove.com website, Mr. Hecker indicated that when a customer is searching for a specific non-U-Haul affiliated eMove.com member, the eMove.com website will display U-Haul owned self-storage facilities."  (Resp. to Statement of Facts [Docket 147-3], Ex. C.)  (3) January 11, 2010 excerpt from call log: "I understand wanting referrals and leads.  Users affiliated with Uhaul should get those without having to turn their business over to Uhaul. . . . SiteLink users trust a software company with their data, not a storage operator competing in most markets." (Resp. to Statement of Facts [Docket 147-10], Ex. J, at 24.)

Allegedly false statement #3: The daily discount takes the credit card fee off the top so that the accountant cannot track full payment.  Evidence that this statement has been disseminated: (1) Lorton Fax: "Daily discount – takes the credit card fee off the top so that the accountant cannot track full payment."

Allegedly false statement #4: eMove's software cannot reconcile insurance and credit card statements.  Evidence that this statement has been disseminated: (1) April 26, 2010 excerpt from call log: "Cannot reconcile insurance and cr [credit] card statements, or arch."

Allegedly false statement #5: Customers cannot access reports for the current day. Evidence that this statement has been disseminated: (1) Lorton Fax: "Can not access reports for current day.  Only from day before."

Allegedly false statement #6: eMove charges for certain types of reservations. Evidence that this statement has been disseminated: (1) Lorton Fax: "There are charges for reservations. No charge with Sitelink."

Allegedly false statement #7: Echo is eMove's payment processor.  Evidence that this statement has been disseminated: (1) Lorton Fax: "Echo is the payment processor."

Allegedly false statement #8: U-Haul's rental website is faster than eMove's webpage. Evidence that this statement has been disseminated: (1) Lorton Fax: "The truck rental portion is faster than the storage software.  The storage software is browser based and therefore dependent upon the internet speed and traffic."

In sum, these allegedly false statements can be found in three places: the Lorton Fax, excerpts from the call log dated April 26, 2010, and January 11, 2010, and Mr. Goldsberry's declaration.  Five of the eight allegedly false statements are found only in the Lorton Fax.  The customer who received the Lorton Fax switched from the defendants' to the plaintiff's product. One statement has only been recorded once in the call log.  And the other two statements can be found in two or three places.

In contrast, the relevant purchasing public is large.  The parties agree that there are between 52,000 and 54,000 self-storage facilities in the United States.  The plaintiff contends that many of these facilities do not use self-storage software.  However, neither party proposes an alternative measure of the market.  And even if the market has fewer purchasers than the total number of self-storage facilities, there must be, at the very least, several thousand self-storage facilities that have purchased or would consider purchasing self-storage software.  In fact, eMove alone has 2,207 Premier Affiliates who pay for access to WebSelfStorage.

Whether the relevant purchasing public is over 50,000 facilities or several thousand, the evidence shows that the statements have been disseminated to a tiny fraction of the market.  The instant dispute is readily distinguishable from cases where a similar number of representations were found to be commercial promotion because the market was significantly smaller.  *See Coastal Abstract Serv., Inc.*, 173 F.3d at 735; *Seven-Up Co.*, 86 F.3d at 1386.

The plaintiff asserts, however, that these statements were actually repeated many more times—perhaps thousands of times.  As support, the plaintiff notes that eMove is mentioned over fifty times in the defendants' call log to at least thirty-five customers or potential customers.  The plaintiff cites examples in its response to the defendants' motion for summary judgment, including:

i. Emails:

1. "[Customer] . . . is questioning the monthly pricing he is paying.  He has been approached by U-move recently about e-move and finds the cost difference staggering.  Not unhappy with SL but is questioning the cost.  Please call him at [phone number].  Email is [email address]." (Resp. to Statement of Facts [Docket 147-10], Ex. J, at 48.)
2. "We are losing 5 or so stores a month to emove.  I have ideas for ad campaigns.  Bundling and boots on the ground are their advantage."  (*Id.* at 45.)
3. "Has U-Haul and considering going to e-move.  Offered to have salesman call to discuss possibly working with him since we don't want to lose his business.  Markus, you can reach [customer] at [phone number]."  (*Id.* at 53.)
4. "we continue to be the only pure-play web based software.  Centershift is behind with their old product and their new; uhaul's product is basic.  Most importantly: both products are owned by storage operators (extra space and uhaul) who compete with users of their software." (*Id.* at 47.)

ii. Call Log

1. "Emove has a number of fees. Reports awful."  (*Id.* at 25.)
2. "[X] is trying to convince owner to convert – emailed over list of features and quote. . . . [X] hates emove – he doesn't seem hopeful that he can convert that site, but I told him I could work with him on the pricing." (*Id.* at 29.)
3. "Mh got [customer]: mh emailing link.  Us and emove." (*Id.* at 15.)
4. "Meant to call back.  Still in decision making phase.  Us and other web based: emove.  Will talk to husband in a few days.  Call mh back.  Got my email."  (*Id.* at 14.)
5. "owner wants to switch to EMove . . . will have MH call . . . [Customer] ended up staying on slew [SiteLink] but only after a long discussion.  Thanks markus."  (*Id.* at 30.)
6. "Emove has offered a trial and it is pretty tempting – 45/month. . . says that he has 30 sites and if the price was [X]/month he would do it, but doesn't think he can do it for the [X]/month.  Told him I would have mh follow." (*Id.* at 17)
7. "mh got [customer].  Used to have sl.  Then, switched out, limit on units and no mobile at the time. . . . Using EMOVE.  . . . MH emailed."  (*Id.* at 22.)

8. "MH got [customer].  Going EMOVE initially.  Told him about emove and backups. Oh boy. Sent email." (*Id.* at 5.)

9. "MH got [customer]: does want to move on soft.  Does like SL. Adding fence next year.  Doing uhaul about not excited about emove, told him the story." (*Id.* at 21.)

The plaintiff argues that the trier of fact may conclude that because there is evidence that the defendants said each allegedly false statements once, twice, or at most three times, the defendants must have said each statement many more times because there is evidence that the defendants discussed eMove and WebSelfStorage.  I disagree.  Although the evidence must be construed in the light most favorable to the non-moving party, the non-moving party is only entitled to *justifiable* inferences that can be drawn from the evidence.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The trier of fact cannot justifiably infer from the evidence presented that the defendants sufficiently disseminated each allegedly false statement of fact such that it constitutes a commercial advertisement or promotion in this market.  And as another court recently observed: "[T]estimony that a general message is or has been conveyed to unspecified customers, at an unspecified time, in an unspecified manner, and by unspecified persons is insufficient to satisfy the threshold requirement of a Lanham Act claim—that the accused statements were made in 'commercial advertising or promotion.'" *Schutz Container Sys., Inc. v. Mauser Corp.*, No. 1:09-cv-3609, 2012 WL 1073153, at *28 (N.D. Ga. Mar. 28, 2012).  Accordingly, I **FIND** that the plaintiff has failed to demonstrate a genuine issue of material fact as to whether these allegedly false statements are commercial advertisements or promotions.  Therefore, I **GRANT** the defendants' motion for summary judgment as to these Lanham Act claims.

      ii.     <u>Falsity</u>

The plaintiff alleges that the following post created by Mr. Hecker for an Internet message board on January 24, 2008, is false:

> In May 2008, we will release a free listing service and search engine optimization (SEO) for our Web Edition customers.  We will push Web Edition customers' web sites to the top of searches using Google and other engines.
>
> Compare that to UHAULS referrals.  Some UHAUL dealers, but not most, claim there are referrals from other UHAUL dealers.  The 2 features above are available in SiteLink out of the box.  No other software offers such broad-based value, ready to use, at no more cost than one simple web site setup.
>
> Showing at or near the top of ANY search exposes owners' web sites to more clients than the narrow UHAUL system.  Join UHAUL just the same, still get their referrals, but why limit exposure to a closed network vs. the entire web by not using SiteLink Web Edition?

(Resp. to Statement of Facts [Docket 147-9], Ex. I.)

The defendants claim that this post "makes a very specific comparison: it describes SiteLink's listing service and search engine optimization and then states: 'Compare that to UHAULS referrals.'"  (Defs.' Mot. Summ. J. [Docket 70], at 28.)  It is undisputed that U-Haul and eMove have a referral program that allows store-to-store referrals, called the Secured Online Affiliation Rentals, or "S.O.A.R."  The program allows premier affiliates and U-Haul dealers to rent a storage unit at another's facility for a tenant, and the referring business earns a commission for the rental.  The S.O.A.R. program is available only to U-Haul dealers and premier affiliates.  Neither basic affiliates nor self-storage facilities that do not use the services marketed by eMove can participate.  It is distinct from the online rental pages provided for affiliates on webselfstorage.com.  The plaintiff does not contest this description of S.O.A.R., and therefore it has failed to create a genuine issue of material fact as to whether it is false to assert that U-Haul and eMove's referral program is closed.

The plaintiff asserts, however, that Mr. Hecker conveyed a different message in the January 24, 2008 post: that eMove.com is a closed system, i.e., that the website is not open to Internet search engines. The plaintiff has submitted the declaration of Sam Celaya, eMove's director. Mr. Celaya states that, "eMove's online marketplace is an open, not closed, system." (Resp. to Statement of Facts [Docket 147-2], Ex. B.) In addition, "Open systems are web-based programs that are accessible from outside of the system." (*Id.*)

To determine what assertion(s) Mr. Hecker's post could reasonably convey, I look at it in its entire context. The beginning of the second paragraph states: "Compare that to UHAUL referrals." This indicates to the reader that the post compares the defendants' search engine optimization with U-Haul and eMove's S.O.A.R. program. The final sentence states: "still get their referrals," which reaffirms that S.O.A.R. is being discussed. Nothing in the post suggests that Mr. Hecker is asserting that eMove's affiliate sites are not accessible through Internet search engines. In addition, it seems unlikely that the defendants would suggest that eMove.com itself is closed, because this assertion can be tested and proven false so easily. Accordingly, I **FIND** that no reasonable trier of fact could conclude that Mr. Hecker's post amounts to an assertion that eMove.com is not open to Internet search engines. Moreover, if an advertisement is literally true, but the plaintiff claims it is misleading, the plaintiff must produce extrinsic evidence of the way it is perceived by customers, often through market research or consumer surveys. *Walker & Zanger, Inc. v. Paragon Indus., Inc.*, 549 F. Supp. 2d 1168, 1182 (N.D. Cal. 2007). eMove has not produced extrinsic evidence of the way this statement was perceived by customers.

In sum, I **FIND** that there is no genuine issue of material fact and **GRANT** the defendants' motion for summary judgment as to the plaintiff's Lanham Act claims. The parties agree that common law unfair competition is congruent with false advertising under the Lanham

Act.   Consequently, I **GRANT** the defendants' motion for summary judgment as to the plaintiff's claim for common law unfair competition.

   *b.  Intentional Interference with a Business Relationship*

   To prevail on a claim of intentional interference with a business relationship, the plaintiff must "identify a specific relationship with which the defendant interfered."   *Dube v. Likins*, 216 Ariz. 406, 414 (Ariz. Ct. App. 2007).   In its response to the defendants' motion for summary judgment, the plaintiff states: "The call-logs clearly show that the Defendants have defamed eMove to anyone who will listen; eMove had a business expectancy with the customers and potential customers that called Defendants to inquire about eMove." (Resp. Defs.' Mot. Summ. J. [Docket 146], at 35.)   eMove does not identify which alleged interferences caused which specific business relationships or expectancies to be disrupted.   The plaintiff cannot create a genuine dispute of material fact by pointing generally to actions that the defendants have allegedly taken and asserting that these actions harmed its business relationships or expectancies in general.   Accordingly, I **FIND** that there is no genuine issue of material fact and **GRANT** the defendants' motion for summary judgment as to this claim.

   *c.  Injurious Falsehood*

   In Arizona, injurious falsehood is "the publication of matter derogatory to the plaintiff's business which is calculated to prevent others from dealing with him."   *Aldabbagh v. Ariz. Dept. of Liquor Licenses & Control*, 162 Ariz. 415 (1989).   The plaintiff must show resulting pecuniary loss.   *Allen v. Quest Online, LLC et al.*, No. CV11-138-PHX-GMS, 2011 WL 4403674, at *8 (D. Ariz. Sept. 22, 2011).

   Some of the analysis from the Lanham Act claims applies here.   There is no genuine issue of material fact as to the falsity of Mr. Hecker's January 24, 2008 message board post.   In

addition, five of the allegedly false statements are only found in the Lorton Fax. It is undisputed that Lorton subscribed to WebSelfStorage following receipt of the fax. Therefore, the plaintiff cannot show pecuniary loss. Accordingly, the plaintiff has failed to raise a genuine issue of material fact as to whether these statements are actionable under the tort of injurious falsehood.

Three allegedly false statements remain:

Allegedly false statement #1: eMove affiliates can only obtain leads and reservations through U-Haul-owned self-storage facilities. Evidence that this statement has been disseminated: (1) the Lorton Fax: "The leads gained are from U-Haul customers only" and "Makes the manager look good by getting more leads but the leads are only from U-Haul and not from the entire internet." (Decl. Erick Ottoson Supp. Defs.' Mot. Summ. J. [Docket 72-2], Ex. 1.) (2) April 26, 2010 excerpt from call log: "Reservations only by uhaul reservations, and $6.96 or so fee for tenant, $20 or so for owner. Only uhaul reservation tenants can rate you." (Resp. to Statement of Facts [Docket 147-10], Ex. J, at 8.)

Allegedly false statement #2: eMove is set up solely for the benefit of eMove's parent, U-Haul. Evidence that this statement has been disseminated: (1) the Lorton Fax: "U-Haul is set up for U-Haul self-storage facilities." (2) Colorado trade show: Mr. Goldsberry, an eMove employee, stated in his declaration that: "Mr. Hecker also stated that eMove.com serves to benefit U-Haul owned self-storage facilities. As an example of how U-Haul owned self-storage facilities are benefited by the eMove.com website, Mr. Hecker indicated that when a customer is searching for a specific non-U-Haul affiliated eMove.com member, the eMove.com website will display U-Haul owned self-storage facilities." (Resp. to Statement of Facts [Docket 143-10], Ex. C.) (2) January 11, 2010 excerpt from call log: "I understand wanting referrals and leads. Users affiliated with Uhaul should get those without having to turn their business over to Uhaul. . . .

SiteLink users trust a software company with their data, not a storage operator competing in most markets."  (Resp. to Statement of Facts [Docket 147-10], Ex. J, at 24.)

Allegedly false statement #3: eMove cannot reconcile insurance and credit card statements.  Evidence that this statement has been disseminated: (1) April 26, 2010 excerpt from call log: "Cannot reconcile insurance and cr [credit] card statements, or arch."

Of course, the plaintiff cannot show pecuniary loss for the statements in the Lorton Fax. Therefore, the remaining statements have allegedly been disseminated in the following instances: discussions with customers recorded in the call logs from April 26, 2010, and January 11, 2010, and the Colorado trade show.  The plaintiff has not presented testimony from anyone who allegedly received these statements.  Rather, the only evidence of damages that the plaintiff has presented in this lawsuit is the testimony and expert report of Morris C. Aaron.  (Resp. to Statement of Facts [Docket 147-8], Ex. H.)  As I stated at the hearing, I harbor grave doubts about the admissibility of the proposed expert testimony under Federal Rule of Evidence 702. Nevertheless, the plaintiff's injurious falsehood claims fail even if the expert report were admitted.

Mr. Aaron opines that eMove's growth rate declined beginning in 2007, and he attributes this to the defendants' alleged campaign of disparagement.  As one "specific example" of SMD's disparaging comments, the report cites the January 11, 2010 call log.  However, the report does not connect this statement, or any statement made by the defendants, with the alleged resulting pecuniary loss.  In sum, the record is wholly devoid of evidence that the statements allegedly made on April 26, 2010, and January 11, 2010, and at the Colorado trade show caused harm to the plaintiff.  Accordingly, I **FIND** that there is no genuine issue of material fact and **GRANT** the defendants' motion for summary judgment as to the injurious falsehood claims.

## VI.     Rule 15(d) Motion for Leave to File First Supplemental Complaint

On March 30, 2012, the plaintiff filed a Rule 15(d) Motion for Leave to File First Supplemental Complaint.  The Motion alleges that Mr. Hecker made a false statement about eMove at the Inside Self-Storage World Expo, which was held from March 14 to 16, 2012, in Las Vegas, Nevada.  A U-Haul mystery shopper, Chalet Fuery, spoke with Mr. Hecker at the defendants' booth.  During this conversation, Mr. Hecker allegedly told Ms. Fuery that eMove's call center closed down because it did not have enough clients to keep it open.  The plaintiff asserts that this statement is false.

The plaintiff further argues that the defendants' conduct gives rise to enhanced damages on eMove's claims.  Specifically, 15 U.S.C. § 1117(a) provides that, "If the court shall find that the amount of recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such a sum as the court shall find just, according to the circumstances of the case."  The plaintiff represents that it only anticipates needing to depose Mr. Hecker about this incident, which should not take more than an hour.

Federal Rule of Civil Procedure 15(d) states: "On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented."  FED. R. CIV. P. 15(d).  The defendants do not oppose adding the allegation about the statement made in Las Vegas.  They do oppose, however, the plaintiff's request to add a new damages claim and moving the trial date.  Although I am skeptical of the plaintiff's ability to prevail on its claim for enhanced damages, I will allow the plaintiff to amend its complaint to add a request for them at this time.

Accordingly, I **GRANT** the plaintiff's Motion for Leave to File First Supplemental Complaint.  The court **ORDERS** that the plaintiff submit an amended supplemental complaint by April 24, 2012.  In addition, the court **ORDERS** that the plaintiff is limited in its discovery to one two-hour deposition of Mr. Hecker, and the defendants are limited to one two-hour deposition of Ms. Fuery.

**VII.    Conclusion**

In conclusion, I **GRANT** the defendants' Motion for Summary Judgment and **GRANT** the Rule 15(d) Motion for Leave to File First Supplemental Complaint.  The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: April 20, 2012

Joseph R. Goodwin, Chief Judge